

**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | Case No.   17-15826-SAL |
| Eric W. Abell | * | Chapter   7 |
| Debtor | * | |
| * * * * * * * * * | | |
| Conner, Inc. | * | |
| Plaintiff | * | |
| vs. | * | Adversary No.   17-00314 |
| Eric W. Abell | * | |
| Defendant | * | |
| * * * * * * * * * * * * * * | | |

### MEMORANDUM OF DECISION

Plaintiff Conner, Inc. ("Conner") brings this adversary proceeding against debtor and defendant Eric W. Abell seeking a determination that amounts due to Conner from Mr. Abell's now defunct company, Eric W. Abell, Inc. ("Abell, Inc."), are nondischargeable debts of Mr. Abell under 11 U.S.C. §§523(a)(2)(A) and (B) and (a)(6). Now before the court is a motion for summary judgment filed by Mr. Abell, opposed by Conner. ECF 18, 20. For the reasons stated herein, the court will grant the motion.

The court has jurisdiction over this matter under 28 U.S.C. §§1334 and 157(b) and Local Rule 402 of the United States District Court for the District of Maryland. The court has authority

to enter final judgment in this matter under 28 U.S.C. §157(b)(2)(I) and consistent with the standards of *Stern v. Marshall*, 564 U.S. 462 (2011).

## Material Facts Not In Dispute

Mr. Abell filed a chapter 7 petition on April 27, 2017. Conner timely filed this proceeding seeking to except from discharge a debt purportedly owed to it by Mr. Abell.

Mr. Abell owned and operated Abell, Inc., which filed a chapter 7 bankruptcy petition on April 27, 2017. The chapter 7 trustee entered a Report of No Distribution on November 13, 2017, and the case was closed on November 30, 2017.

Abell, Inc. was a general contractor that performed residential and commercial construction services. Conner provides plumbing and HVAC services, including rough and final installations, as well as maintenance and servicing of plumbing and HVAC systems. Conner served as a subcontractor to Abell, Inc. for a number of years. Conner performed subcontractor services and provided components and materials at various residences and commercial properties where Abell, Inc. was the general contractor.

Abell, Inc. and Conner entered into a number of subcontracts from 2015-2016. During the relevant time period, the parties communicated telephonically, in-person and via email concerning payment of the subcontract invoices.

As described further below, Conner originally asserted claims under 11 U.S.C. §523(a)(2)(A) based on a number of alleged oral misrepresentations made by Mr. Abell to Richard Conner, Conner's President. Now, however, Conner primarily asserts claims under §523(a)(2)(B), based on a series of email messages between Mr. Abell and Christine Weaber, who worked in Conner's accounting department.

The emails follow:

*The May 2016 Emails*:

On May 18, 2016, Ms. Weaber sent an email inquiry to Mr. Abell:

> "Good Morning   As you can see I have a lot of vendor bills and wells[*sic*] bills this month for Gerstell[*sic*]   When can I expect a check?"

On May 18, 2016, Mr. Abell responded as follows:

> "Dear Chris: Before the end of the month for sure!"

Ms. Weaber followed up on May 25, 2016, as follows:

> "Will I have this week??? Tuesday is last day of the month???"

ECF 20-1, p. 133 of 160.

*The July 2016 Emails*:

On July 15, 2016, Ms. Weaber sent the following email to Mr. Abell:

> "Need to know when and how much check or HAUCK will be
> What is status of Gerstell Check?  What is status of Abram Check?
> I really need to know – Vendors are calling me on these 3 jobs for payment"

Mr. Abell responded on July 15, 2016:

> "Chris: I should have approx. $100k as soon as Hauck closes.  Other money will be coming in the near future."

Ms. Weaber's reply that same day was:

> "Ok thanks[*sic*]  When does Hauck close???"

ECF 20-1, p. 137 of 160.  No response to Ms. Weaber's email is in the record.

*The October - November 2016 Emails:*

Ms. Weaber sent an email to Mr. Abell dated October 19, 2016:

> "I need another check next Tuesday October 25th – Need to get HAUCK paid off
> Balance is approximately $50,000[*sic*]   We will get there – Thanks Eric"

On October 20, 2016, Mr. Abell replied:

> "Dear Chris:   OK, I'll do my best. I need some $ to come in here to be able to do it."

3

Ms. Weaber wrote again on October 21, 2016:

> "Just a reminder about check I need on Tuesday – Thanks Chris"

ECF 20-1, p. 145 of 160.  As part of the same communication, subsequent emails were sent a few days later. On October 24, 2016, Mr. Abell stated:

> "Dear Chris:
> I haven't forgot[*sic*] about the check. However, I still need some payments to come in to me to be able to do it tomorrow. I will update you once I check the mail tomorrow."

Ms. Weaber wrote on October 25, 2016:

> "What is status of check??"

ECF 20-1, p. 147 of 160.

On October 28, 2016, Mr. Abell emailed Ms. Weaber again, explaining that he will not be making payment:

> "Hi Chris   Not in the mail today, but I think one of my clients is going to leave me some money over the weekend.  If so, I'll be in touch Monday!"

On November 1, 2016, Ms. Weaber replied:

> "Am I getting Money today?????"

The same day, Mr. Abell replied:

> "Chris: I apologize, nothing over the weekend, but I am supposed to get something later today. I can have Sherry bring you a check tomorrow early if that works?"

ECF 20-1, p. 152 of 160.

*The December 2016 Emails:*

On December 1, 2016, Mr. Abell emailed to Ms. Weaber:

> "Chris: When I got back I had a few checks come in, but not the larger ones I really need to get you money. However, I did contact the folks who were supposed to have mailed them and got a hold of one person late yesterday. He says he is mailing it today which should put it here Saturday or Monday. The minute I get it I will get you a check. I [*sic*] really sorry for this mess, I'm just counting on these checks to come in and they aren't on time."

4

And Ms. Weaber replied:

> "Ok --- I need to know the AMOUNT of the check so I can plan Eric. You know what the person is sending so what is Conner getting"

ECF 20-1, p. 156 of 160.  No response to Ms. Weaber's email is in the record.

During the period of March 2015 through January 2017, Abell, Inc. experienced financial difficulty and was at all relevant times, delinquent in payments to Conner.  However, Abell, Inc. made the following material payments to Conner from May 2016 through December 2016:

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 5/3/2016 | $5,007.44 | 7/8/2016 | $1,258.00 | 11/1/2016 | $15,000.00 |
| 5/4/2016 | $3,001.12 | 7/15/2016 | $11,680.22 | 11/7/2016 | $956.93 |
| 5/6/2016 | $794.76 | 7/15/2016 | $580.00 | 11/21/2016 | $1,702.38 |
| 5/10/2016 | $35,000.00 | 7/20/2016 | $571.68 | 11/21/2016 | $1,493.71 |
| 5/16/2016 | $1,734.41 | 7/27/2016 | $1,790.33 | 11/21/2016 | $1,200.63 |
| 5/27/2016 | $30,000.00 | 8/26/2016 | $27,992.00 | 11/30/2016 | $22,105.00 |
| 6/17/2016 | $1,162.95 | 9/8/2016 | $52,300.00 | 11/30/2016 | $24,262.00 |
| 6/17/2016 | $289.00 | 9/21/2016 | $630.00 | 12/7/2016 | $25,000.00 |
| 6/24/2016 | $5,470.00 | 9/21/2016 | $1,871.06 | 12/28/2016 | $652.07 |
| 6/28/2016 | $43,400.00 | 9/25/2016 | $20,000.00 | 12/28/2016 | $1,331.38 |
| 6/29/2016 | $27,500.00 | 10/8/2016 | $20,000.00 | | |

*See* Ex. B to ECF 18 p. 29-30.

## Conclusions of Law

A motion for summary judgment is governed by Fed. R. Civ. P. 56 and is made applicable here under Fed. R. Bankr. P. 7056.  Summary judgment is appropriate if there is no

genuine dispute over any material facts, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> In evaluating a summary judgment motion, a court "must consider whether a reasonable [factfinder] could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). In doing so, a court is not entitled to either weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 255, ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…"). If the moving party is unable to demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied. *See Celotex* 477 U.S. at 323.

*Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 351–352 (4th Cir. 2007).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Those specific facts must be supported by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Matushita*, 475 U.S. at 586-587. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson*, 477 U.S. at 247-248.

Here, Conner brings claims under §523(a)(2)(A) (Count 1), §523(a)(2)(B) (Count 2), and §523(a)(6) (Count 3). To prevail on a claim that a debt should be excepted from discharge, a

creditor must prove all the elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991).

The court will address each Count in turn.

**Count 1: Section 523(a)(2)(A)**

"The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" *Cohen v. De La Cruz,* 523 U.S. 213, 217 (1998). This policy is codified in §523. Section 523(a)(2)(A) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt
> \*\*\*\*\*
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

§523(a)(2)(A). To establish a claim under §523(a)(2)(A), a plaintiff must prove four elements: "(1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation." *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126,134 (4th Cir. 1999).

In the complaint, Conner alleged that Mr. Abell made a number of oral misrepresentations to Mr. Conner that Abell, Inc. would pay Conner when it received a contract payment from an owner on a particular contract. Conner also alleges that Mr. Abell made these representations after Abell, Inc. received the owner payments and used the funds for other purposes. The complaint alleges that these representations were false and misleading and induced Conner to continue to perform work on the project subcontracts. The complaint alleges

7

that Mr. Abell is personally obligated on Abell, Inc.'s debt to Conner because of his fraud, and the debt is excepted from discharge under §523(a)(2)(A).

After the complaint was filed, but prior to the July 10, 2018 hearing on the motion for summary judgment, the Supreme Court issued its decision in *Lamar, Archer & Cofrin, LLP v. Appling,* 138 S.Ct. 1752 (2018). There, the Court held that a statement about a single asset can be a "statement respecting the debtor's financial condition" within the meaning of §523(a)(2)(B). If a claim is based on a misrepresentation "respecting the debtor's financial condition" it must be made in writing to provide a basis for relief under §523(a)(2).

In *Lamar*, Appling hired the Lamar law firm to represent him in business litigation. When Appling fell behind on his legal bills, he told Lamar he was expecting a $100,000 tax refund. Lamar continued to represent Appling based on this representation. Ultimately, Appling received a tax refund of only $59,851 and spent the tax refund on his business. Following receipt of the tax refund, Appling again told Lamar the refund had not been received. Again Lamar continued legal representation and delayed collection on the outstanding invoices based on this representation. Subsequently, Lamar obtained a judgment against Appling, who then filed a chapter 7 bankruptcy.

Lamar filed a nondischargeability complaint under §523(a)(2)(A). Appling moved to dismiss the complaint contending that the statements about his receipt of a tax refund were "respecting [his] financial condition" and therefore governed by §523(a)(2)(B). Appling argued that his oral representations did not meet the §523(a)(2)(B) requirement that a statement respecting a debtor's financial condition must be in writing, and therefore the complaint must be dismissed.

The Court adopted a broad view that a statement is "respecting" a debtor's financial condition "if it has a direct relation to or impact on the debtor's overall financial status." *Id*. at 1761. Therefore, a statement concerning a single asset that has a direct relation or impact on the debtor's overall status can provide the basis for a claim under §523(a)(2)(B). The court ruled that Appling's statements that he was expecting a tax refund were statements respecting his financial condition, and therefore needed to be in writing under §523(a)(2)(B). Because Appling had made only oral representations to Lamar, the complaint had to be dismissed.

Here, Mr. Abell's alleged oral misrepresentations to Mr. Conner—that Abell, Inc. would pay Conner as soon as it was paid by a project owner, allegedly said after receipt of the payment—seem to fit squarely into the standard articulated by the Supreme Court. Further, for §523(a)(2) purposes, there seems to be little difference between Appling's oral representation to Lamar that he would be receiving a tax refund and Mr. Abell's alleged oral representations to Mr. Conner that Abell, Inc. would be receiving an owner payment and paying Conner from the payment.

The court need not resolve those questions, however. At the hearing on the motion for summary judgment, Conner stated that, in response to *Lamar,* it was limiting its claims under §523(a)(2)(A) to a single misrepresentation. It contends that when Mr. Abell entered into subcontracts with Conner, he made an implicit representation that he would pay directly to Conner the portion of any owner payment that was payment for Conner work. Conner alleges Mr. Abell breached that implied representation in violation of §523(a)(2)(A) when he failed to pay Conner from the owner payments.

A "misrepresentation can be any words or conduct which produce a false or misleading

9

impression of fact in the mind of another." *Guaranty Residential Lending v. Koep* (*In re Koep*), 334 B.R. 364, 372 (Bankr. D. Md. 2005) (citing *Kendrick v. Pleasants* (*In re Pleasants*), 231 B.R. 893, 897 (Bankr. E.D. Va. 1999)). A "misrepresentation may be implied by silence." *Household Fin. Corp. v. Kahler* (*In re Kahler*), 187 B.R. 508, 512 (Bankr. E.D. Va. 1995) (citing *Central Bank v. Kramer (In re Kramer)*, 38 B.R. 80, 82 (Bankr. W.D. La. 1984)). "Omissions . . . can constitute misrepresentations . . . where the circumstances of the case are such that the omissions or failure to disclose creates a false impression which is known by the debtor." *Kahler*, 187 B.R. at 512 (citing *Peterson v. Bozzano (In re Bozzano)*, 173 B.R. 990, 993 (Bankr. M.D.N.C. 1994)). A misrepresentation may exist notwithstanding the fact that the debtor did not "affirmatively state a misrepresentation or was never asked to disclose pertinent facts." *Id*.

Here, the record presents no facts that, at the time the parties entered into the subcontracts, Mr. Abell said anything or took any actions that could constitute an implicit misrepresentation that he would pay directly to Conner the portion of any owner payment that was payment for Conner's work. The record is completely devoid of any facts concerning what was said or not said when the parties entered into the subcontracts, who negotiated the subcontracts, when the parties entered into the subcontracts, or any other similar facts. Discovery is now complete, and Conner's contention that Mr. Abell made an implicit misrepresentation at the time they entered the subcontracts is nothing more than an unsupported allegation. And the court notes that it would have been easy for Conner to request an express representation or other contractual protection in the subcontracts, and it is not the court's task to rewrite the terms agreed to by the parties.

Further, Mr. Conner's affidavit does not support this claim. To the contrary, his affidavit establishes that he believed that Abell, Inc. had a statutory legal obligation to pay directly to

Conner the portion of any owner payment that was payment for Conner work.  Specifically, Mr. Conner states that he "knew [Mr. Abell] was required by statute to pay Conner as soon as he received funds for Conner's work."  ECF 20-1 at ¶78.  Mr. Conner's belief that Mr. Abell had a legal obligation imposed by statute to pay the funds to Conner makes academic any implied representation by Mr. Abell.  His belief negates any reliance he could have had on an alleged implied representation that Mr. Abell would do so.

The foregoing is true whether or not Mr. Conner's understanding of the law is correct.  As discussed in connection with Count 3, however, Mr. Conner's understanding of the law is not correct.  Mr. Conner relies on Md. Code Ann., Real Prop. §10-502, which states that "[a]ny consideration received by a custom home builder in connection with a custom home contract shall be held in trust *for the benefit of the buyer*."  Real Prop. §10-502 (emphasis added).  As discussed in connection with Count 3, this statute does not establish a trust relationship between the contractor who receives the owner funds and the subcontractor who performed the work.  This conclusion is significant to Conner's claim that Mr. Abell violated §523(a)(6).  But for purposes of Conner's §523(a)(2)(A) claim, Mr. Conner's subjective belief that Mr. Abell was legally obligated to pay the funds directly to Conner undermines that claim.

Summary judgment will be granted to Mr. Abell on Count 1.

**Count 2: Section 523(a)(2)(B)**

Section 523(a)(2)(B) bars discharge where the debtor obtains credit that was induced by a false written statement respecting the debtor's or an insider's financial condition.  *Field v. Mans*, 516 U.S. 59, 65-66 (1995).  In order to satisfy §523(a)(2)(B), a creditor must prove: (1) the debtor used a statement in writing respecting the debtor's or an insider's financial condition; (2) that the statement was materially false; (3) that the creditor reasonably relied upon it; and (4) that

the debtor made the statement with intent to deceive.  *Koep,* 334 B.R. at 372-373 (citing *Ins. Co. of N. Am. v. Cohn (In re Cohn),* 54 F.3d 1108, 1114 (3d Cir.1995)).

Conner points to a series of emails between Mr. Abell and Ms. Weaber from May 2016 to December 2016 in support of its claims.  The content of the emails is not in dispute; they are set forth in detail above in the Material Facts Not In Dispute.  The parties dispute whether the emails contain actionable misrepresentations under §523(a)(2)(B).

The May 2016 Emails cannot provide a basis for a claim under either §523(a)(2)(A) or §523(a)(2)(B).  There is nothing in these emails that is a statement "respecting the debtor's or an insider's financial condition" and therefore §523(a)(2)(B) does not apply.  To the extent the statement by Mr. Abell that he would send a check by the end of the month could be a representation under §523(a)(2)(A), the record establishes that Abell, Inc. issued check number 5867 to Conner on May 31, 2016, in the amount of $30,000.  Thus, no misrepresentation was made.

In the July 15, 2016 email, Mr. Abell stated that "I should have approx. $100k as soon as Hauck closes."  ECF 20-1, p. 137 of 160.  This email exchange also does not support Conner's misrepresentation argument.  The record does not establish when the Hauck project closed.  Mr. Abell's email also made no promises, and did not state what amount from the $100,000 he planned on paying over to Conner.  Lastly, his use of the word "should" makes a justifiable reliance claim by Conner problematic because it states a probability of payment versus a statement of certainty.

Further, even if the email is read as a representation by Mr. Abell that he would pay Conner something when the Hauck contract closed, the record shows that Mr. Conner is not owed any money for the Hauck project.  Mr. Conner's affidavit fails to include the Hauck project

in its list of named projects for which Conner is still owed money. ECF 20-1. The record shows that Abell, Inc. paid Conner $91,972.22 after this email exchange: $11,680.22 on July 15, 2016, $27,992 on August 26, 2016, and $52,300 on September 8, 2016. For all these reasons, on this record, no reasonable factfinder could conclude that Mr. Abell made a misrepresentation when he said "I should have approx. $100k as soon as Hauck closes." *Id.* at p. 137 of 160.

      The October-November, 2016 Emails also do not establish a claim for misrepresentation. As pertinent here, on October 19, 2016, Ms. Weaber sent an email to Mr. Abell that stated "I need another check next Tuesday October 25th . . . ." ECF 20-1, p. 145 of 60. Mr. Abell responded, "Dear Chris: OK, I'll do my best. I need some $ to come in here to be able to do it." *Id*. On October 24, 2016, the day before the date by which Conner needed a check, Mr. Abell proactively wrote: "Dear Chris: I haven't forgot[*sic*] about the check. However, I still need some payments to come in to me to be able to do it tomorrow. I will update you once I check the mail tomorrow." ECF 20-1, p. 147 of 160. On October 28, 2016, Mr. Abell wrote to Ms. Weaber: "Hi Chris [*sic*] Not in the mail today, but I think one of my clients is going to leave me some money over the weekend. If so, I'll be in touch Monday!" ECF 20-1, p. 152 of 160. Finally, on November 1, 2016, Mr. Abell wrote "Chris: I apologize, nothing over the weekend, but I am supposed to get something later today. I can have Sherry bring you a check tomorrow early if that works?" *Id*. The record establishes that Abell, Inc. paid Conner $15,000 by check dated November 2, 2016.

      No reasonable factfinder could conclude that these emails contain a misrepresentation. On October 19, 2016, Mr. Abell simply stated that he would "do [his] best" to get a check to Conner by October 25, and that he needed some money to come in to do so. Nothing in the record could establish that Mr. Abell did not do his best or did not need funds to come in to make

13

a payment to Conner. Further, assuming Mr. Abell were found not to have "done [his] best" Abell, Inc. paid Conner $15,000 on November 2, 2016. Thus, Mr. Abell had a check issued to Conner within a week of October 25, 2016, the date by which he pledged to do his best to pay Conner. No reasonable factfinder could conclude that the foregoing is an actionable misrepresentation under §523(a)(2)(B).

Mr. Abell's emails of October 24 and 28, 2016, and November 1, 2016, essentially promise updates on the status of payments. Mr. Abell provided those updates on October 28 and November 1. The October 28 update may have been two days later than promised, but that is certainly not a fraudulent misrepresentation.

The December 2016 Emails do not establish a claim for misrepresentation. Mr. Abell wrote to Ms. Weaber on December 2, 2016:

> Chris: When I got back I had a few checks come in, but not the larger ones I really need to get you money. However, I did contact the folks who were supposed to have mailed them and got a hold of one person late yesterday. He says he is mailing it today which should put it here Saturday or Monday. The minute I get it I will get you a check. I [*sic*] really sorry for this mess, I'm just counting on these checks to come in and they aren't on time.

ECF 20-1, p.156 of 160. The record fails to establish that any of these statements are not true, as for example, that larger checks did come in and Mr. Abell hid that from Conner, that Mr. Abell did not contact folks about payment, that one person did not tell him what Mr. Abell stated, or that he was not counting on checks to come in. In any event, Abell, Inc. paid Conner $25,000 on December 7, 2016, which is consistent with Mr. Abell's statements.

Summary judgment will be granted to Mr. Abell on Count 2.

**Count 3: Section 523(a)(6)**

In Count 3, Conner alleges that it held a property interest in the owner payments received by Abell, Inc. that included payment of the subcontract work it performed. It alleges Mr. Abell

14

converted the funds when he used them for purposes other than paying them over to Conner. Conner contends that Mr. Abell's conversion of the owner payments constitutes "willful and malicious injury by the debtor to …[Conner's] property" under §523(a)(6).

Section 523(a)(6) provides that an individual debtor is not entitled to discharge from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The words "willful" and "malicious" create distinct requirements for a creditor seeking an order of dischargeability. *See First Nat'l Bank of Md. v. Stanley (In re Stanley),* 66 F.3d 664, 667-668 (4th Cir. 1995). The U.S. Supreme Court clarified that the word "willful" in §523(a)(6) means a deliberate or intentional injury. *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998). Subsequently, the Fourth Circuit has adopted the so-called "objective substantial certainty test" or "subjective motive" test. *Parsons v. Parks (In re Parks),* 91 Fed. Appx. 817, 819 (4th Cir. 2003)) (adopted the test in *In re Miller,* 156 F.3d 598, 603 (5th Cir. 1998)). In sum, the test "is whether the debtor acted with 'substantial certainty [that] harm [would result] or a subjective motive to cause harm.'" *In re Parks,* 91 Fed. Appx. at 819.

Malice means "an act causing injury without just cause or excuse. . . [A] plaintiff creditor can . . . establish malice on an implied basis from a showing of debtor's behavior, as well as a presentation of the surrounding circumstances." *Johnson v. Davis,* 262 B.R. 663, 670-71 (Bankr. E.D. Va. 2001) (citing *St. Paul Fire & Marine Ins. Co. v. Vaughn,* 779 F.2d 1003, 1010 (4th Cir. 1985)).

Conner's claims under §523(a)(6) fail because it cannot establish a property interest in the owner payments. Conner contends that Mr. Abell and Abell, Inc. held the portion of owner payments for the subcontract work that Conner performed in trust for Conner's benefit. It contends that the trust relationship gives it a property interest in the funds to which §523(a)(6)

applies. Conner relies on the Maryland Custom Home Protection Act, codified at Md. Code Ann., Real Prop. §10-501, *et seq*. Section 10-502 of the Act states:

> Any consideration received by a custom home builder in connection with a custom home contract shall be held in trust *for the benefit of the buyer*. Payments made to subcontractors or suppliers in connection with the custom home contract shall be consistent with the trust.

Real Prop. §10-502 (emphasis added). By its terms, however, the statute creates a trust relationship between the contractor and the buyer of the custom home. It does not establish a trust for the benefit of the subcontractor. *In re Marino*, 115 B.R. 863, 869 (Bankr. D. Md. 1990) (Section 10-502 "creates a technical trust in favor of the buyer/owner, but not in favor of subcontractors or suppliers").

Real Prop. §10-502 stands in stark contrast to Real Prop. §9-201, which does not apply here. Real Prop. §9-201 provides:

> (b)(1) Any money paid under a contract by an owner to a contractor, or by the owner or contractor to a subcontractor for work done or materials furnished, or both, for or about a building by any subcontractor, shall be held in trust by the contractor or subcontractor, as trustee, *for those subcontractors who did work or furnished materials, or both, for or about the building, for purposes of paying those subcontractors.*
>
> (2) An officer, director, or managing agent of a contractor or subcontractor who has direction over or control of money held in trust by a contractor or subcontractor under paragraph (1) of this subsection is a trustee for the purpose of paying the money to the subcontractors who are entitled to it.

Real Prop. §9-201(emphasis added). Further §9-202 provides:

> Any officer, director, or managing agent of any contractor or subcontractor, who knowingly retains or uses the money held in trust under §9-201 of this subtitle, or any part thereof, for any purpose other than to pay those subcontractors for whom the money is held in trust, shall be personally liable to any person damaged by the action.

Real Prop. §9-202. The Maryland Court of Appeals considered the predecessor statute of §9-201 and concluded that it "creates a trust relationship between the contractor or subcontractor that has

16

been paid by the owner and the subcontractor for whose work the owner has paid." *Ferguson Trenching Co., Inc. v. Kiehne*, 619 A.2d 735, 737 (Md. 1993). Thus, the Maryland legislator clearly knows how to create a trust in favor of a subcontractor for money paid by an owner for work performed by a subcontractor. The express language in Real Prop. §10-502 that the trust is "for the benefit of the buyer" negates Conner's assertion that the trust is in favor of the subcontractor.

Conner points to no contract language or any other evidence that could establish that the owner payments received by Abell, Inc. for work performed by Conner were held in trust for its benefit. Accordingly, Conner's claim that it holds a property interest in the owner payments fails. Summary judgment will be granted to Mr. Abell on Count 3.

## Conclusion

For the foregoing reasons, the court will grant Mr. Abell's motion for summary judgment. A separate order will follow.

cc:

Conner, Inc.
524B Lincoln St.
Denton, MD 21629

Charles J. Brown
Gellert, Scali, Busenkell & Brown, LLC
1201 N. Orange St. Ste. 300
Wilmington, DE 19801

Eric W. Abell
28332 Brick Row Dr.
Oxford, MD 21654

Adam M. Lynn
McAllister, DeTar, Showalter & Walker
100 N. West St.
Easton, MD 21601

**END OF MEMORANDUM OF DECISION**